**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TRUSTAR BANK

Plaintiff,

v.

THE NATIONAL CAPITAL BANK OF WASHINGTON

Defendant.

Case No. _______________

**COMPLAINT AND PETITION FOR DECLARATION OF RIGHTS**

The Plaintiff, Trustar Bank, by counsel, states as follows for its Complaint and Petition for Declaration of Rights against the Defendant, The National Capital Bank of Washington:

**PARTIES**

1. Trustar Bank ("Trustar") is a corporation organized and existing under the laws of the Commonwealth of Virginia. Trustar's principal office located at 774 Walker Rd., Ste. A, Great Falls, VA 22066, and its principal place of business is located in Virginia. Trustar is, and at all times relevant hereto was, a citizen of the Commonwealth of Virginia.

2. The National Capital Bank of Washington ("NCB") is a national banking association organized and existing under the laws of the United States. NCB's principal office located at 316 Pennsylvania Ave., SE, Washington, DC 20003, and its principal place of business is located in Washington, D.C. NCB is, and at all times relevant hereto was, a citizen of the District of Columbia. *See*, e.g., 28 U.S.C. § 1348.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Trustar, a citizen of

Virginia, and NCB, a citizen of the District of Columbia, as alleged in ¶¶ 1–2 above, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because NCB resides in this District within the meaning of 28 U.S.C. § 1391(c)(2), and because a substantial part of the events or omissions giving rise to Trustar's claims occurred in this District. Venue is also proper in this District pursuant to 12 U.S.C. § 94.

## FACTUAL ALLEGATIONS

### I. The Loan and the Loan Agreement

5. On February 2, 2024, NCB, as lender, made a commercial real estate loan to "1126 11th St NW Owner LLC," a District of Columbia limited liability company (the "Borrower"), in the original principal amount of $10,250,000.00 (the "Loan"), as evidenced by a Construction Loan Agreement (hereinafter, the "Loan Agreement"), a true and correct copy of which is attached as **Exhibit A**, a Promissory Note (hereinafter, the "Note"), a true and correct copy of which is attached as **Exhibit B**, and other related loan and security documents.

6. The Loan was secured by, among other collateral, a deed of trust encumbering the real property located at 1126 11th Street NW, Washington, DC 20001 (the "Real Property"). The proceeds of the Loan were to be used by Borrower to acquire the Real Property and to construct and renovate a fifty (50)-unit apartment building thereon (the "Project"). The obligations of Borrower under the Loan were guaranteed by Adam Lobene (hereinafter, the "Guarantor" or "Mr. Lobene"), a principal and, upon information and belief, the sole principal and beneficial owner, of Borrower. *See* Guaranty and Indemnification Agreement, a true and correct copy of which is attached as **Exhibit C**.

7. The Loan Agreement was further conditioned on and secured by certain warranties

and representations of Borrower in Article 4 of the Loan Agreement. For instance, in Article 4 of the Loan Agreement, Borrower represented and warranted: (i) that there was no material adverse change in the financial condition or businesses of the Borrower or of Guarantor since the date of the financial statements most recently submitted by Borrower and Guarantor, respectively (Section 4.1); (ii) that there was no action, suit, or proceeding pending or threatened against Borrower (Section 4.4); (iii) that Borrower had no direct or contingent liability known to it and not previously disclosed in writing to NCB, nor knew of or expected any change in Borrower's assets, liabilities, properties, businesses, or conditions, financial or otherwise (Section 4.5); and (iv) that no warranty or representation in the Guaranty and Indemnification Agreement was inaccurate (Section 4.1), which warranties and representations included, without limitation, that there was no pending or threatened litigation "involving or affecting Guarantor … that would have a material adverse effect upon the business or assets of the Guarantor" and that Guarantor was "not in default … under any instrument under which … any indebtedness has been incurred."

8. Among other things, the Loan Agreement identifies as Events of Default: (i) the failure of Borrower or Guarantor to pay any sum owed to NCB in connection with the Loan when due (Section 9.1); (ii) the failure of any representation or warranty made in Article 4 of the Loan Agreement to be accurate when made or to continue to be true and accurate (Section 9.2); (iii) any breach or default under any of the terms, covenants, and conditions set forth in any of the other Loan documents (Section 9.4); (iv) the failure of the Project to be carried on with reasonable dispatch or the discontinuance of construction of the Project for a period of thirty (30) days without NCB's written permission, absent a Force Majeure (Section 9.5); (v) the reasonable judgment of NCB that the Project has not attained or will not attain completion on or before the designated completion date (Section 9.12); (vi) a material adverse change, determined in good faith by

NCB, in the financial condition of Borrower or Guarantor, or to the Real Property such that NCB's security is impaired (Section 9.20); and (vii) a default of any other obligation or indebtedness owed or guaranteed by Borrower or Guarantor to NCB or, in the case of Borrower, to any other lender, which extends beyond the applicable cure period (Section 9.18). More specifically, the Loan Agreement states:

> **ARTICLE 9**
> **EVENTS OF DEFAULT**
>
> Subject to Borrower's Cure Rights as set forth in Article 10 hereinbelow, the occurrence of any one or more of the following events shall constitute an "Event of Default":
>
> **Section 9.1. Failure To Pay.** The failure by the Borrower or the Guarantor to pay any sum of money owed to the Lender in connection with the Loan, including but not limited to any principal, interest, penalty, fee, charge, deposit, advancement, escrow or assessment, as provided in the Promissory Note, the Deed of Trust, the Guaranty, this Agreement, or any other Loan Document, when and as due.
>
> **Section 9.2. Failure of Warranty or Representation.** The failure of any representation or warranty provided in Article 4 hereof to be true and accurate on the date hereof and to continue to be true and accurate.
>
> * * *
>
> **Section 9.4. Default Under Loan Documents.** A breach of or default under any of the terms, covenants, and conditions set forth in any of the other Loan Documents [which includes the Guaranty and Indemnification Agreement, *see* Loan Agreement, p. 4, Section 1.21], and the expiration of any applicable cure period.
>
> **Section 9.5. Delays In Construction.** If the construction of the Project is not carried on with reasonable dispatch or is at any time discontinued for a period of thirty (30) days without written permission of the Lender, unless the discontinuance is the result of a Force Majeure.
>
> * * *
>
> **Section 9.12. Failure To Complete.** If the Project, in the reasonable judgment of the Lender, has not attained or will not [attain] Completion on or before the Completion Date.
>
> * * *

> **Section 9.18. <u>Cross Default</u>.** A default under any obligation or indebtedness owed or guaranteed by the Borrower or the Guarantor to the Lender or, in the case of Borrower, to any other lender, regardless, in either case, of when created or whether secured or unsecured, which default continues past the expiration of any applicable cure period.
>
> * * *
>
> **Section 9.20. <u>Material Adverse Change in Financial Condition</u>.** If the Lender determines in good faith that a material adverse change has occurred (a) in the financial condition of the Borrower or the Guarantor from the financial condition set forth in the most recent financial statements furnished to the Lender or from the financial condition of the Borrower or the Guarantor most recently disclosed to the Lender, or (b) to the Real Property such that the Lender's security for the obligation is impaired.

**Exhibit A**, pp. 26-29.

## II. <u>The Loan Participation Agreement</u>

9. On February 2, 2024, NCB sold and assigned to Trustar, without recourse, an undivided 39.02439% interest in the Loan (the "Participation Interest"), pursuant to a Non-Recourse Loan Participation Certificate and Agreement between NCB and Trustar dated February 2, 2024 (the "Participation Agreement"), a true and correct copy of which is attached as **Exhibit D**.

10. The Loan Agreement (**Exhibit A**) and the Participation Agreement (**Exhibit D**) are separate instruments, executed between different parties and governing different obligations. The Loan Agreement governs the obligations of Borrower to NCB, whereas the Participation Agreement governs the relationship, rights, and obligations between NCB and Trustar with respect to the Loan.

11. Under the Participation Agreement, Trustar's maximum investment was $4,000,000.00, and Trustar in fact funded and held a 39.02439% Participation Interest in the Loan.

12. Section 8 of the Participation Agreement, entitled, "ADMINISTRATION," provides that NCB, "as agent for the Participant [i.e., Trustar]," may take action that it determines,

in its sole discretion, to be appropriate to enforce payment of the Note or to realize upon the collateral, but that NCB shall not, without Trustar's prior written consent, among other things, "determine a course of action to take with respect to a default by Borrower." **Exhibit D**, p. 4. Section 8 of the Participation Agreement provides further, and immediately thereafter, that:

> Notwithstanding the foregoing, if the Bank [i.e., NCB] and the Participant [i.e., Trustar] are unable to agree upon any action described in the preceding sentence that requires the consent of the Participant, the decision regarding such action shall be made by the beneficial owners of a majority in amount of the Note, and such decision shall be binding upon the Bank and the Participant; provided that (i) no such decision shall extend the maturity of, or change the interest rate on, the Note, forgive any principal or interest on the Note or diminish any of the Collateral without the prior written consent of both the Bank and the Participant and (ii) if the Participant refuses to consent to any such action when requested to do so by the Bank, the Bank may, at any time thereafter, at its option, purchase the interest of the Participant in the Note for a price equal to the Unpaid Participant's Investment, plus all accrued but unpaid interest thereon at the Participant's Interest Rate, and, upon such payment, this Agreement, all rights of the Participant hereunder and all interest of the Participant in the Note shall cease.

*Id.*, pp. 4-5.

13. Section 8 of the Participation Agreement further provides that NCB "shall, with reasonable promptness, within five (5) business days, notify the Participant [i.e., Trustar] of any material default of the Borrower of which it becomes aware and of any other matters of which it becomes aware that, in its judgment, materially affect the interests of the parties in the Loan." *Id.*, p. 5.

14. Section 8 of the Participation Agreement further provides that NCB, in servicing and managing the Loan, "will service and manage the Loan in accordance with its usual practices and will exercise the same degree of care to protect the Participant's [i.e., Trustar's] interest in the Loan as it does its own interest in the Loan," and that, "[s]o long as the Bank [i.e., NCB] exercises such care in the servicing and management of the Loan," NCB shall have no liability to Trustar for actions taken or not taken in the exercise of NCB's judgment or that may seem to NCB to be

necessary or desirable in the servicing and management of the Loan, "except for [NCB's] gross negligence or willful misconduct." *Id.*, pp. 4-5.

15. Section 12 of the Participation Agreement, entitled "INDEMNIFICATION," provides that NCB "will indemnify against and hold the Participant [i.e., Trustar] harmless from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, demands, disbursements, costs and expenses, including, without limitation, reasonable attorney's fees, incurred by the Participant arising out of (i) the gross negligence or willful misconduct in originating, servicing or managing the Loan…" *Id.*, p. 6.

16. The Participation Agreement contains a choice-of-law provision stating that the Participation Agreement is governed by the laws of the District of Columbia. *Id.*, p. 7.

## III. <u>Trustar's Multiple Inquiries to NCB Regarding the Status of the Loan</u>

17. From December 2024 through 2025, Trustar expressed specific concerns to NCB about delays in the Project and the pace of construction, concerns to which NCB provided no meaningful responses.

18. For instance, Trustar's officer, Lee Boyle, sent the following emails to NCB:

- 12/11/2024 email from Mr. Boyle to NCB: "Is construction progressing on schedule? I have a feeling it is behind schedule." NCB provided no information as to construction progress.

- 4/10/2025 email from Mr. Boyle to NCB: "Have you had any recent conversations with Adam about the pace of construction? I am curious if he has run into any unexpected delays." NCB provided no information as to communications with the Guarantor, if any, or as to the pace of construction.

- 5/15/2025 email from Mr. Boyle to NCB "I've been noticing that the subject loan has been collecting undrawn deposits due in part to construction being slower than expected." NCB provided no response to this email.

- 7/3/2025 email from Mr. Boyle to NCB "This project has been moving slower than I expected, and I heard from worrisome things about Adam a couple months ago through the grapevine. Have any time today or next

week to discuss?" NCB provided no response to this email.

- 11/6/2025 email from Mr. Boyle to NCB "I've been meaning to get an update from you by phone about this credit. When would be a good time next week for you to talk?" NCB provided no response to this email.

*See* Emails, collectively attached as **Exhibit E**, at, respectively, pp. 1-3, 4-5, 6-10, 11-14, and 15-16.

## IV. Borrower's Defaults and NCB's Delayed Notice to Trustar

19. In or about October 2025, NCB learned that Borrower lacked adequate funds to complete the Project financed by the Loan.

20. The development identified in ¶ 19 of this Complaint—i.e., Borrower's lack of adequate funds to complete the Project—constituted a clear Event of Default under the Loan Agreement.

21. The development identified in ¶ 19 of this Complaint—i.e., Borrower's lack of adequate funds to complete the Project—constituted a matter "that materially affect[ed] the interests of the parties in the Loan" under Section 8 of the Participation Agreement. Absent additional capital, Borrower was unable to complete construction of the Project, jeopardizing the value of the collateral securing the Loan and the parties' ability to recover their respective investments in the Loan.

22. In or about December 2025, Borrower failed to make a payment required under the Loan when due.

23. The development identified in ¶ 22 of this Complaint constituted a second Event of Default under the Loan Agreement.

24. The development identified in ¶ 22 of this Complaint constituted a matter "that materially affect[ed] the interests of the parties in the Loan" under Section 8 of the Participation

Agreement. A missed payment on the Loan was itself an Event of Default entitling NCB to accelerate the Loan and pursue all available remedies, and bore directly on the parties' ability to assess Borrower's and Guarantor's capacity to service the Loan going forward and the likelihood of full payment of Trustar's Participation Interest.

25. NCB's own internal credit-risk records confirm its contemporaneous knowledge of Borrower's and Guarantor's deteriorating financial condition. On January 8, 2026, NCB's Deputy Chief Credit Officer downgraded the Loan's internal risk rating from a 4 ("Pass") to a 6 ("Special Mention"), based, among other things, on: (i) a decline in the appraised value of the Real Property, with the as-complete value falling from $17,400,000.00 to $14,800,000.00, and the as-stabilized value falling from $17,800,000.00 to $15,500,000.00, as reflected in an updated appraisal dated December 4, 2025; (ii) the Loan being 28 days past due; (iii) Guarantor's advisement to NCB that he lacked the financial capacity to make the Loan's December 2025 interest payment; and (iv) a decline in Guarantor's credit score to 508. A true and correct copy of NCB's January 8, 2026 downgrade memorandum is attached as **Exhibit F**. That December 4, 2025 appraisal, prepared by CBRE, Inc. at NCB's request, also valued the Real Property "as is" at $8,500,000.00 (income capitalization approach) and $9,200,000.00 (sales comparison approach) as of November 21, 2025—only marginally above Borrower's $8,496,800.00 purchase price for the Real Property in January 2024—and disclosed that construction on the Project had been halted since April 2025 due to financing issues, with recommencement of the Project not anticipated until February 2026 and completion not anticipated until October 1, 2026. A true and correct copy of the December 4, 2025 appraisal is attached hereto as **Exhibit G**.

26. Five days later, on January 13, 2026, NCB further downgraded the Loan's internal risk rating to a 7 ("Substandard – Nonaccrual"), following a meeting that day among NCB's Chief

Lending Officer, Chief Credit Officer, Deputy Chief Credit Officer, and Borrower, at which Borrower disclosed to NCB, for the first time: (i) that the equity investor previously identified to NCB as a potential source of capital to complete the Project had withdrawn from negotiations; (ii) that Borrower had multiple other real estate projects financed by other lenders that were being restructured, were in default, or, in one instance, in foreclosure; and (iii) that other potential investors had indicated interest in the Property only at a valuation approximately $2,000,000.00 below its most recently appraised value. NCB's own contemporaneous memorandum documenting this meeting acknowledged that these disclosures "were not previously disclosed to the Bank and represent a material deterioration in the borrower's financial condition, liquidity, contingent liabilities, and overall risk profile." A true and correct copy of NCB's January 13, 2026 downgrade memorandum is attached hereto as **Exhibit H**.

27. Both NCB's January 8, 2026 downgrade memorandum and January 13, 2026 downgrade memorandum memorialize that NCB was in "frequent communications" with Guarantor since October 2025 regarding potential equity partners and alternative capital sources to facilitate Project completion. However, NCB withheld all of this information from Trustar until January 2026.

28. Upon information and belief, NCB contemporaneously learned, and certainly should have learned, of the halt of construction in April 2025, as stated in the December 4, 2025 appraisal (**Exhibit G)**.

29. The April 2025 halt in construction identified above constituted a clear Event of Default under the Loan Agreement, and, also, a matter "that materially affect[ed] the interests of the parties in the Loan" under Section 8 of the Participation Agreement. The cessation of construction on the Project directly jeopardized Borrower's ability to complete the Project on

schedule, thereby threatening the value of the collateral securing the Loan and the parties' respective ability to recover their investments in the Loan.

30. Notwithstanding NCB's knowledge of the developments and defaults identified in ¶¶ 19, 22, and 28 of this Complaint, and notwithstanding the express requirement of Section 8 of the Participation Agreement that NCB notify Trustar, within five (5) business days of discovering any material default or any other matter materially affecting the interests of the parties to the Participation Agreement (hereinafter, the "Disclosure Obligation and Duty"), NCB failed to notify Trustar of the developments and defaults identified in ¶¶ 19, 22, and 28 of this Complaint (hereinafter, the "Developments and Defaults") until January 2026.

31. As a direct and foreseeable result of NCB's failure to timely notify Trustar of the Developments and Defaults, Trustar was deprived, during the period of NCB's non-disclosure, of the contractual protections afforded to Trustar under Section 8 of the Participation Agreement, including Trustar's right to withhold consent to, or object to, or press for any course of action (or inaction) to be taken by NCB as to the Borrower's multiple default(s); its right to invoke the majority-in-interest decision-making mechanism provided for in Section 8 of the Participation Agreement; and, if a majority of the beneficial owners of the Note decided on a course of action to which Trustar did not agree, its right to withhold consent and thereby require that, if NCB wished to override Trustar's lack of consent, NCB purchase Trustar's Participation Interest "for a price equal to the Unpaid Participant's Investment, plus all accrued but unpaid interest thereon at the Participant's Interest Rate…" **Exhibit D**, Section 8, pp. 4-5 (hereinafter, the "Contractual Protections").

## V. <u>NCB's Undisclosed Conflicts of Interest</u>

32. Upon information and belief, NCB's multi-months delays in declaring Borrower's

default, in disclosing that default to Trustar, and in initiating enforcement action and foreclosure proceedings against Borrower and a collection action against the Guarantor was motivated by NCB's own undisclosed and conflicting financial interests, rather than by NCB's independent business judgment as to the course of action that would best protect the interests of the parties to the Participation Agreement, including Trustar.

33. Upon information and belief, at all operative times herein, NCB held, in its own right, at least one separate loan or other extension of credit to Borrower and/or Guarantor (hereinafter, the "Separate Loan/Extension"), which Separate Loan/Extension was subject to default or acceleration in the event of a declared default or foreclosure on the Loan.

34. Upon information and belief, because of Borrower's and Guarantor's deteriorating financial condition, described further below, the Separate Loan/Extension was in default also.

35. The development identified in ¶ 34 of this Complaint constituted a clear Event of Default under the Loan Agreement.

36. The development identified in ¶ 34 of this Complaint constituted a matter "that materially affect[ed] the interests of the parties in the Loan" under Section 8 of the Participation Agreement. By virtue of the cross-default provisions in Section 9.18 of the Loan Agreement, it constituted an independent, additional Event of Default under the Loan Agreement, directly threatening the value of the collateral securing the Loan and the parties' respective ability to recover their investments in the Loan.

37. The development identified in ¶ 34 of this Complaint was material. By virtue of the cross-default provisions in Section 9.18 of the Loan Agreement, it constituted an independent, additional Event of Default under the Loan Agreement, directly threatening the value of the collateral securing the Loan and the parties' respective ability to recover their investments in the

Loan.

38. Notwithstanding NCB's knowledge of the development identified in ¶ 34 of this Complaint, and notwithstanding the express requirement of Section 8 of the Participation Agreement that NCB notify Trustar, within five (5) business days of discovering any material default or any other matter materially affecting the interests of the parties to the Participation Agreement (hereinafter, the "Disclosure Obligation and Duty"), NCB failed to notify Trustar of the development identified in ¶ 34 of this Complaint.

39. NCB, through its omission of the development identified in ¶ 34 of this Complaint in its communications with Trustar, coupled with what NCB *did* say and communicate to Trustar concerning the Loan, created the false impression and made the false representation that NCB's course of conduct with respect to the Loan was nothing more than NCB's ordinary and reasonable exercise of discretion and business judgment as the lead lender under the Participation Agreement.

40. Additionally, at all operative times herein, NCB was actively engaged in merger and/or sale discussions with other financial institutions.

41. These active, ongoing negotiations created added financial incentive for NCB to avoid declaring a default on the Loan, initiating foreclosure on the Real Property, or triggering a cross-default on Borrower's and/or Guarantor's other obligations to NCB, which would have adversely affected NCB's merger and/or sale opportunities and would have triggered NCB's reporting requirements to its regulators, which also would have chilled NCB's ability to consummate a merger and/or sale of NCB.

42. For instance, Section 9.18 of the Loan Agreement provides that a default under any obligation or indebtedness owed by Borrower or Guarantor to NCB, "regardless of when created or whether secured or unsecured," which default continues beyond the expiration of any applicable

cure period, is itself an Event of Default under the Loan Agreement. **Exhibit A**, p. 28. By virtue of this cross-default provision, a declared Event of Default on the Loan would itself have constituted a default triggering a cross-default on the Separate Loan/Extension, and, vice versa, a default on the Separate Loan/Extension would itself have constituted an Event of Default under the Loan Agreement.

43. Upon information and belief, had NCB declared an Event of Default on the Loan, initiated foreclosure on the Real Property, or otherwise taken enforcement action against Borrower or Guarantor on the Loan, NCB would, by virtue of the cross-default provision described above, likewise have been required to declare a default on the Separate Loan/Extension NCB held with Borrower and/or Guarantor.

44. Further, upon information and belief, declaring a default on the Loan, and the resulting cross-default described above, would have required NCB to classify both the Loan and the Separate Loan/Extension to Borrower and/or Guarantor as nonperforming or otherwise adversely classified assets, to report those adverse classifications to its primary federal regulator, the Office of the Comptroller of the Currency, and to increase its allowance for loan and lease losses to reserve against the resulting losses, each of which would have reduced NCB's reported earnings and capital, which, in turn, would have interfered with NCB's merger and/or sale efforts.

45. NCB did not disclose to Trustar the inherent conflicts of interest described in the preceding paragraphs, including, without limitation, the conflicts of interest arising from NCB's Separate Loan/Extension to Borrower and/or Guarantor. Instead, NCB represented to Trustar that its course of conduct with respect to the Loan reflected nothing more than the ordinary and reasonable exercise of its discretion and business judgment as the lead lender under the Participation Agreement.

46. NCB willfully and intentionally chose not to declare a timely default on the Loan, not to timely initiate foreclosure on the Real Property, and not to otherwise pursue enforcement action against Borrower or Guarantor, because doing so would cross default other NCB loans related to Borrower and/or Guarantor, which would: (1) trigger NCB's regulatory reporting requirements; (2) negatively impact NCB's loss reserve obligations; (3) negatively impact NCB's actual financial condition; and (4) otherwise have a palpable chilling effect on NCB's merger and/or sale efforts.

47. This willful and intentional conduct or, alternatively, grossly negligent conduct, violates the Participation Agreement, and has economically damaged Trustar, which now, in addition to other damages suffered, has had to reserve over $900,000 as a result of NCB's conduct and breaches of the Participation Agreement.

## VI. Borrower's and the Guarantor's Contemporaneous Pattern of Default, Financial Distress, and Resulting Harm to Trustar.

48. Upon information and belief, throughout the period in which NCB concealed from Trustar the Developments and Defaults and the default status of NCB's Separate Loan/Extension to Borrower and/or Guarantor, the Guarantor and entities owned or controlled by him were simultaneously in default under numerous other loans secured by other real property in the District of Columbia, and Guarantor and his affiliated projects were the subject of multiple lawsuits filed in the Superior Court of the District of Columbia alleging default, concealment of defaults, and related misconduct, evidencing a broader and contemporaneous pattern of financial distress bearing directly on Guarantor's and Borrower's ability to satisfy their obligations to NCB and, derivatively, to Trustar.

49. For instance, on October 9, 2025, Naikan I SPV, LLC filed a verified complaint in the Superior Court of the District of Columbia, Civil Action No. 2025-CAB-006793, against

Guarantor and entities affiliated with him, seeking damages of not less than $6,675,944.44 and the appointment of a receiver over real property located at 429 13th Street NE, Washington, DC, arising from Guarantor's and his affiliates' default, in or about August and September 2025, under a $7,200,000 loan personally guaranteed by Mr. Lobene (the "Naikan Action"). A true and correct copy of the complaint filed in the Naikan Action is attached as **Exhibit I**.

50. The loan at issue in the Naikan Action, like the Loan in this case, contains a cross-default provision, and the timing of Mr. Lobene's and his affiliates' default thereunder—in the same months that NCB was concealing from Trustar the Developments and Defaults—illustrates the interconnected and cascading financial distress affecting Mr. Lobene's various real estate holdings and guaranty obligations.

51. Additionally, on January 12, 2026, Arc Environmental, LLC filed a complaint in the Superior Court of the District of Columbia, Civil Action No. 2026-CAB-000238, against Mr. Lobene and American Housing LLC, seeking payment of unpaid environmental consulting fees relating to certain real property, evidencing Mr. Lobene's and his affiliates' inability or unwillingness to timely satisfy even routine trade obligations during the period relevant to this Complaint (the "Arc Environmental Action"). A true and correct copy of the complaint filed in the Arc Environmental Action is attached as **Exhibit J**.

52. Additionally, on or about May 19, 2026, Justin Ehrlich and entities under his control filed a verified complaint in the Superior Court of the District of Columbia, Civil Action No. 2026-CAB-003402, against Mr. Lobene, American Housing LLC, and affiliated entities, seeking compensatory damages in excess of $6,700,000 for fraudulent misrepresentation, breach of fiduciary duty, and securities fraud arising from Mr. Lobene's solicitation of real estate investments through false representations concerning secured financing and his concealment of

pre-existing defaults and cross-default provisions affecting those investments (the "Ehrlich Action"). A true and correct copy of the complaint filed in the Ehrlich Action is attached as **Exhibit K**.

53. The Ehrlich Action alleges, among other things, that beginning in or about April 2025, Mr. Lobene concealed from an investor a pre-existing default, and its associated cross-default provisions, on a separate loan secured by property related to the investment, in order to induce further investment; that a related property, The Huntington, at 5225 Connecticut Avenue NW, Washington, DC, was foreclosed upon due to a default on a senior loan, resulting in the total loss of a $2,000,000 investment; and that Mr. Lobene misappropriated tenant security deposits and diverted investor capital contributions to satisfy undisclosed related-party obligations.

54. The Naikan Action, the Arc Environmental Action, and the Ehrlich Action (collectively, the "Related Actions") were each filed against Mr. Lobene and/or his affiliated entities within months of Borrower's defaults on the Loan, and each alleges circumstances and defaults materially similar to the Developments and Defaults, including default on secured indebtedness, concealment of known defaults and cross-default provisions from counterparties, and resulting impairment of those counterparties' collateral and investment positions.

55. The Related Actions corroborate and confirm that, throughout the period NCB concealed from Trustar the developments identified in ¶¶ 19, 22, 28, and 34 of this Complaint, Borrower's financial condition, Guarantor's personal financial condition, and the financial condition of Borrower's and Guarantor's affiliates, were deteriorating rapidly across multiple, unrelated properties and credit relationships, such that Borrower's and Mr. Lobene's capacity to perform under the Loan and the Guaranty and Indemnification Agreement, respectively, and Borrower's and Mr. Lobene's collective capacity to satisfy their obligations to NCB and Trustar,

were being depleted by competing creditors and investors in real time.

56. Upon information and belief, at all operative times herein, including, without limitation, NCB knew and was aware of the Related Actions and the factual circumstances described therein.

57. The Related Actions, the events and defaults described therein, and the deteriorating financial condition of Borrower and Mr. Lobene, constituted and were both Events of Default under the Loan Agreement and matters "that materially affect[ed] the interests of the parties in the Loan" under Section 8 of the Participation Agreement. However, notwithstanding NCB's knowledge of the Related Actions, the events and defaults described therein, and the deteriorating financial condition of Borrower and Guarantor, and notwithstanding NCB's Disclosure Obligation and Duty under Section 8 of the Participation Agreement, NCB failed to notify Trustar of the Related Actions, the factual circumstances described therein, and the deteriorating financial condition of Borrower and Guarantor.

58. As a direct and foreseeable result of NCB's failure to notify and disclose to Trustar the Related Actions, the events and defaults described therein, and Borrower's and Guarantor's deteriorating financial condition and defaults under the Loan Agreement, Trustar was denied the opportunity to timely evaluate and act upon the risk posed by Borrower's and Guarantor's spreading financial distress and multiplying creditor and investor claims, including by pursuing or advocating for enforcement action or invoking the majority-in-interest decision-making mechanism under Section 8 of the Participation Agreement, before Borrower's and Guarantor's assets, and the value of Mr. Lobene's guaranty, were further eroded by the claims asserted in the Related Actions and by potential claims of other creditors, and by withholding consent to any course of action decided by a majority of the beneficial owners of the Note to which Trustar did

not agree, and thereby require that, if NCB wished to override Trustar's lack of consent, NCB purchase Trustar's Participation Interest "for a price equal to the Unpaid Participant's Investment, plus all accrued but unpaid interest thereon at the Participant's Interest Rate…" **Exhibit D**, Section 8, pp. 4-5.

59. Guarantor's and Borrower's deteriorated financial condition, confirmed by the Related Actions, further impaired the value of the collateral securing the Loan and the practical recoverability of amounts owed to Trustar under the Participation Agreement, and constitutes additional harm and damages resulting from NCB's willful and/or grossly negligent conduct as alleged herein.

**VII. The Parties' Demand and Response Correspondence**

60. On June 22, 2026, Trustar sent NCB a written demand that NCB repurchase Trustar's Participation Interest in the Loan, at par plus accrued interest, in the amount of $3,352,732.67, based on NCB's mishandling of the administration and collection of the Loan.

61. By letter dated July 10, 2026, NCB declined to repurchase Trustar's Participation Interest, denied that it had breached the Participation Agreement, and falsely asserted that it had "properly exercised its discretion" and had consulted with and involved Trustar throughout the relevant period. NCB's July 10, 2026 letter further asserted that, pursuant to Section 10 of the Participation Agreement, Trustar is obligated to reimburse NCB for certain expenses NCB has incurred in connection with the Loan.

62. Had Trustar known that NCB, as the lead bank responsible for administering and enforcing the Loan on behalf of the parties to the Participation Agreement, would subordinate Trustar's interests to NCB's own undisclosed and conflicting financial interests as described above, and otherwise would fail to timely notify Trustar of the Developments and Defaults and the

Related Actions, the factual circumstances described therein, and the deteriorating financial condition of Borrower and Guarantor, Trustar would not have entered into the Participation Agreement or invested $4,000,000.00 to acquire its Participation Interest in the Loan in the first place.

63. As a further and independent consequence of NCB's herein-described conduct and breaches of the Participation Agreement, Trustar itself has been required to classify its impaired participation interest in the Loan as a nonperforming or otherwise adversely classified asset on its own books and regulatory filings, which has resulted in Trustar having to increase its own reserves to account for the anticipated losses associated with the Loan.

64. This increased loss reserve reduces Trustar's reported earnings and regulatory capital which are reflected in Trustar's financial statements and regulatory filings, causing Trustar to appear less well-capitalized and profitable than it would otherwise be to its regulators, shareholders, and other participants in the banking industry, as well as to the general public.

65. This impairment of Trustar's own reported financial condition and standing is a direct and foreseeable consequence of NCB's willful and intentional, or, alternatively, grossly negligent, herein-described conduct and breaches of the Participation Agreement, and constitutes additional harm and damages for which Trustar is entitled to recover.

66. As a further and independent consequence of NCB's conduct and breaches of the Participation Agreement, Trustar has suffered increased carrying costs on the Loan, diminution in the value of the collateral securing the Loan, and impairment of Trustar's participation interest in the Loan.

67. Trustar has formally invoked Section 12 ("INDEMNIFICATION") of the Participation Agreement by requesting that NCB indemnify against and hold Trustar harmless

from all of its herein-described damages by reason of NCB's herein-described conduct and breaches of the Participation Agreement. However, NCB, in response, has refused to do so.

68. Recently, NCB caused the Real Property to be sold at a foreclosure sale, at which foreclosure sale NCB itself purchased the Real Property for $3,100,000.00.

69. Upon information and belief, following the foreclosure sale, NCB failed to properly secure the Real Property, and squatters are now illegally occupying the Real Property. Upon information and belief, the process of lawfully removing the squatters from the Real Property will require additional time before the Real Property can be marketed and sold, further increasing the losses Trustar has suffered and will suffer as a result of NCB's herein-described conduct.

70. All of NCB's herein-described conduct and breaches of the Participation Agreement were either willful or grossly negligent.

## COUNT I
## BREACH OF CONTRACT (PARTICIPATION AGREEMENT)

71. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 70 above as if fully set forth herein.

72. The Participation Agreement is a valid, binding, and enforceable contract between Trustar and NCB.

73. Trustar has performed all obligations required of it under the Participation Agreement, or any such obligations have been excused or waived.

74. Section 8 of the Participation Agreement obligated NCB to notify Trustar, with reasonable promptness and in no event later than five (5) business days after becoming aware, of any material default of Borrower or any other matter materially affecting the interests of the parties to the Participation Agreement (i.e., the Disclosure Obligation and Duty).

75. NCB breached the Disclosure Obligation and Duty by failing to timely notify

Trustar of the developments and facts identified in ¶¶ 19, 22, 25-28, and 34 of this Complaint until January 2026.

76. NCB breached the Disclosure Obligation and Duty by failing to notify Trustar of the Related Actions, the events and defaults described therein, and the deteriorating financial condition of Borrower and Guarantor, all as identified and described above, all of which also constituted Events of Default under the Loan Agreement.

77. Section 8 of the Participation Agreement prohibited NCB, without Trustar's prior written consent, from unilaterally determining a course of action to take with respect to a default by Borrower.

78. NCB breached the contractual obligation identified in ¶ 77 of this Complaint by unilaterally electing not to act, and by failing to act, with respect to Borrower's known defaults for a period of months, without Trustar's knowledge or consent.

79. Section 8 of the Participation Agreement further obligated NCB, in servicing and managing the Loan, to exercise the same degree of care to protect Trustar's interest in the Loan as NCB exercises to protect its own interest.

80. NCB breached the obligation identified in ¶ 79 of this Complaint by subordinating Trustar's interest in the Loan to NCB's own undisclosed and conflicting financial interests, as described above, by failing to timely notify Trustar of the Developments and Defaults and failing to notify Trustar at all of the Related Actions, the factual circumstances described therein, and the deteriorating financial condition of Guarantor, all of which constituted Events of Default under the Loan Agreement.

81. Section 8 of the Participation Agreement provides that NCB may not, without Trustar's written consent, extend the maturity of the Note or diminish any of the collateral.

82. By unilaterally electing for months not to declare an Event of Default under the Loan Agreement, initiate foreclosure proceedings against the Real Property, and initiate collection proceedings against Borrower and Guarantor, NCB, in breach of Section 8 of the Participation Agreement, unilaterally, without Trustar's written consent, diminished the collateral.

83. Pursuant to Section 12 of the Participation Agreement ("INDEMNIFICATION"), NCB is required to indemnify and hold Trustar harmless from all of its herein-described damages, including, without limitation, Trustar's reasonable attorney's fees (hereinafter, the "Indemnity Obligation and Duty").

84. NCB breached the Indemnity Obligation and Duty by refusing to indemnify and hold Trustar harmless from all of its herein-described damages, including, without limitation, Trustar's reasonable attorney's fees.

85. All of NCB's above breaches of the Participation Agreement were willful or, alternatively, grossly negligent.

86. NCB's above breaches of the Participation Agreement harmed Trustar in numerous ways, including, without limitation, preventing NCB from invoking and exercising the Contractual Protections and causing NCB to incur attorney's fees and legal costs.

87. As a direct and proximate result of NCB's breaches of the Participation Agreement, Trustar has suffered damages, including but not limited to increased carrying costs on the Loan, diminution in the value of the collateral securing the Loan, and impairment of Trustar's Participation Interest, in an amount to be proven at trial but not less than $75,000.00. The severity of this diminution and impairment is confirmed by the contemporaneous deterioration in Borrower's and Mr. Lobene's financial condition, as described in ¶¶ 19, 22, 25-28, and 48-59 above, including the defaults, foreclosure, and creditor and investor claims asserted in the Related

Actions. Trustar's damages have been further increased by NCB's foreclosure sale of the Real Property and NCB's failure to secure the Real Property against unauthorized occupancy thereafter, as described in ¶¶ 68-69 above.

**WHEREFORE,** Trustar respectfully requests that this Court enter judgment against NCB on Count I, and award Trustar compensatory damages in an amount to be proven at trial but not less than $75,000.00, together with pre-judgment and post-judgment interest, costs, reasonable attorney's fees and legal expenses, and such other and further relief as the Court deems just and proper.

**COUNT II**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

88. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 87 above as if fully set forth herein.

89. Under District of Columbia law, every contract, including the Participation Agreement, contains an implied covenant of good faith and fair dealing, which prohibits either party from doing anything that will have the effect of injuring or destroying the right of the other party to receive the fruits of the contract. The implied duty of good faith and fair dealing broadly prohibits a party to a contract from acting, in the exercise of contractual discretion or otherwise, unreasonably, arbitrarily, or capriciously in the performance of its contractual obligations so as to evade the spirit or intendment of the contract.

90. In failing to disclose or timely disclose the developments and facts identified in ¶¶ 19, 22, 28, and 34 of this Complaint, the Related Actions, the events and defaults described therein, the deteriorating financial condition of Borrower and Guarantor, the fact of and conflicts of interest arising from NCB's other dealings with Borrower and Guarantor, including, without limitation, NCB's Separate Loan/Extension to Borrower and/or Guarantor, and that NCB's course of conduct

with respect to the Loan was materially motivated, influenced, and effected by NCB's conflicts of interest (all hereinafter collectively referred to as, the "Omitted Matters"), NCB, in breach of the implied covenant of good faith and fair dealing, acted unreasonably, arbitrarily, and capriciously, so as to interfere with, injure, and destroy the right of Trustar to receive the fruits of the Participation Agreement.

91. To the extent that the Participation Agreement vests NCB with discretion in the origination, servicing, and management of the Loan, NCB breached the implied covenant of good faith and fair dealing by exercising that discretion unreasonably, arbitrarily, capriciously, and in bad faith, so as to interfere with, injure, and destroy the right of Trustar to receive the fruits of the Participation Agreement. NCB did so by, without limitation, committing the conduct identified in ¶ 90 of this Complaint, and also by permitting its course of conduct with respect to the Loan to be substantially influenced by its own undisclosed and conflicting financial interests, described above, rather than by an honest and disinterested assessment of the interests of the participants in the Loan.

92. NCB's breach of the implied covenant of good faith and fair dealing harmed Trustar in numerous ways, including, without limitation, preventing Trustar from invoking and exercising the Contractual Protections.

93. As a direct and proximate result of NCB's breach of the implied covenant of good faith and fair dealing, Trustar has suffered damages in an amount to be proven at trial but not less than $75,000.00. The severity of this diminution and impairment is confirmed by the contemporaneous deterioration in Borrower's and Mr. Lobene's financial condition described in ¶¶ 19, 22, 25-28, and 48-59 above, including the defaults, foreclosure, and creditor and investor claims asserted in the Related Actions. Trustar's damages have been further increased by NCB's

foreclosure sale of the Real Property and NCB's failure to secure the Real Property against unauthorized occupancy thereafter, as described in ¶¶ 68-69 above.

**WHEREFORE,** Trustar respectfully requests that this Court enter judgment against NCB on Count II, and award Trustar compensatory damages in an amount to be proven at trial but not less than $75,000.00, together with pre-judgment and post-judgment interest, costs, reasonable attorney's fees and legal expenses, and such other and further relief as the Court deems just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY

94. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 93 above as if fully set forth herein.

95. Section 8 of the Participation Agreement designates NCB as acting, and at all operative times herein NCB did act and assume to act, "as agent for the Participant" with respect to the enforcement and collection of the Loan and the realization upon the collateral.

96. By virtue of this agency relationship, NCB owed Trustar fiduciary duties, including, without limitation, the duty of loyalty, which required NCB to act solely in Trustar's interest in matters within the scope of the agency and to refrain from placing its own interests in conflict with Trustar's interest without full disclosure of the operative conflicts of interest to, and the informed consent of, Trustar.

97. NCB breached its duty of loyalty to Trustar by subordinating Trustar's interest in the prompt enforcement and collection of the Loan to NCB's own undisclosed and conflicting financial interests, described above, without disclosing to Trustar that those interests were influencing NCB's conduct and without obtaining Trustar's informed consent to proceed notwithstanding the conflicts of interest.

98. NCB breached its duty of loyalty to Trustar by failing to timely notify and disclose to Trustar the Omitted Matters.

99. NCB breached its duty of loyalty to Trustar by its conduct in connection with NCB's realization upon the Collateral—including the foreclosure sale of the Real Property and NCB's subsequent failure to properly secure the Real Property, permitting squatters to occupy it, as described in ¶¶ 68-69 above—without regard to Trustar's interest in the Collateral.

100. NCB's breaches of its duty of loyalty were willful, in that NCB knew of its own conflicting interests and knowingly failed to disclose them to Trustar while representing that its conduct reflected nothing more than an ordinary exercise of business judgment. NCB's breaches of its duty of loyalty were also willful in that NCB knew of the Omitted Matters and knowingly failed to disclose them to Trustar.

101. NCB's breaches of its duty of loyalty harmed Trustar in numerous ways, including, without limitation, preventing Trustar from invoking and exercising the Contractual Protections.

102. As a direct and proximate result of NCB's breaches of fiduciary duty, Trustar has suffered damages in an amount to be proven at trial but not less than $75,000.00. The severity of this diminution and impairment is confirmed by the contemporaneous deterioration in Borrower's and Mr. Lobene's financial condition described in ¶¶ 19, 22, 25-28, and 48-59 above, including the defaults, foreclosure, and creditor and investor claims asserted in the Related Actions. Trustar's damages have been further increased by NCB's foreclosure sale of the Real Property and NCB's failure to secure the Real Property against unauthorized occupancy thereafter, as described in ¶¶ 68-69 above.

103. NCB's conduct as described above was willful and taken in conscious disregard of Trustar's rights, or, alternatively, constituted gross negligence, entitling Trustar to an award of

punitive damages in an amount to be determined at trial.

**WHEREFORE,** Trustar respectfully requests that this Court enter judgment against NCB on Count III, and award Trustar compensatory damages in an amount to be proven at trial but not less than $75,000.00, punitive damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest, costs, reasonable attorney's fees and legal expenses, and such other and further relief as the Court deems just and proper.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION BY OMISSION**

104. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 103 above as if fully set forth herein.

105. NCB had a duty and obligation to timely disclose the Omitted Matters to Trustar and to exercise reasonable care in identifying and timely disclosing to Trustar any development materially affecting Trustar's interest in the Loan, including each of the Omitted Matters. That duty and obligation existed by virtue of NCB's fiduciary duties to Trustar arising from NCB's agency and fiduciary relationship with Trustar. It also existed by virtue of the parties' course of dealing and NCB's superior access, through and in light of NCB's day-to-day service and management of the Loan and NCB's Separate Loan/Extension to Borrower and Guarantor, to information regarding the financial condition of Borrower and Guarantor. In addition, it existed by virtue of the fact that NCB, at all operative times, knew that Trustar was relying upon the information and statements of NCB for use in guiding Trustar in its business and economic affairs.

106. NCB did not timely disclose to Trustar the Omitted Matters. This omission resulted in the false impression and false representation of full disclosure by NCB in relation to the Loan, and that the Loan remained in good standing.

107. The Omitted Matters, which NCB did not timely disclose to Trustar, were material.

Without limitation, had NCB timely disclosed the Developments and Defaults to Trustar, it would have invoked and exercised the Contractual Protections.

108. NCB's failure to disclose the Omitted Matters to Trustar resulted in and conveyed the false impression and false representation of full disclosure by NCB in relation to the Loan, that the Loan remained in good standing, and that NCB's servicing and management of the Loan was not influenced by undisclosed conflicts of interest arising from NCB's other dealings with Borrower and Guarantor, including, without limitation, the Separate Loan/Extension to Borrower and Guarantor.

109. NCB knew, or in the exercise of reasonable care should have known, that Trustar would rely and was relying upon NCB to timely and truthfully advise it of such defaults, developments, and facts in order to exercise its rights and protect its interest in the Loan under the Participation Agreement and to otherwise guide Trustar in its business and economic affairs.

110. Trustar reasonably relied upon NCB's above omissions of material fact to Trustar's detriment. In the absence of full and truthful disclosure by NCB of the Omitted Matters, Trustar was unable to invoke or exercise the Contractual Protections.

111. NCB, in making the above negligent misrepresentations by omission, was grossly negligent.

112. As a direct and proximate result of NCB's grossly negligent misrepresentations and concealments, Trustar has suffered damages, including but not limited to Trustar itself having been required to classify its impaired participation interest in the Loan as a nonperforming or otherwise adversely classified asset on its own books and regulatory filings, which has resulted in Trustar having to increase its own reserves to account for the anticipated losses associated with the Loan. Additionally, Trustar has incurred and suffered increased carrying costs on the Loan, diminution

in the value of the collateral securing the Loan, and impairment of Trustar's Participation Interest, in an amount to be proven at trial but not less than $75,000.00. The severity of this diminution and impairment is confirmed by the contemporaneous deterioration in Borrower's and Mr. Lobene's financial condition described herein, including the defaults, foreclosure, and creditor and investor claims asserted in the Related Actions. Trustar's damages have been further increased by NCB's foreclosure sale of the Real Property and NCB's failure to secure the Real Property against unauthorized occupancy thereafter, as described in ¶¶ 68-69 above.

**WHEREFORE,** Trustar respectfully requests that this Court enter judgment against NCB on Count IV, and award Trustar compensatory damages in an amount to be proven at trial but not less than $75,000.00, together with pre-judgment and post-judgment interest, costs, reasonable attorney's fees and legal expenses, and such other and further relief as the Court deems just and proper.

**COUNT V**
**FRAUD BY OMISSION (FRAUDULENT CONCEALMENT)**

113. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 112 above as if fully set forth herein.

114. NCB had a duty and obligation to timely disclose the Omitted Matters to Trustar. That duty and obligation existed by virtue of NCB's fiduciary duties to Trustar arising from NCB's agency and fiduciary relationship with Trustar. It also existed by virtue of the parties' course of dealing and NCB's superior access, through and in light of NCB's day-to-day service and management of the Loan and NCB's Separate Loan/Extension to Borrower and Guarantor, to information regarding the financial condition of Borrower and Guarantor. In addition, it existed by virtue of the fact that NCB, at all operative times, knew that Trustar was relying upon the information and statements of NCB for use in guiding Trustar in its business and economic affairs.

115. The Omitted Matters were material. Without limitation, had NCB disclosed the Omitted Matters to Trustar, it would have invoked and exercised the Contractual Protections.

116. NCB willfully failed to disclose the Omitted Matters to Trustar. These omissions of material fact (hereinafter, the "Omissions") resulted in and conveyed the false impression and false representation of full disclosure by NCB in relation to the Loan, that the Loan remained in good standing, and that NCB's servicing and management of the Loan was not influenced by undisclosed conflicts of interest arising from NCB's other dealings with Borrower and Guarantor, including, without limitation, the Separate Loan/Extension to Borrower and Guarantor.

117. NCB made the Omissions with knowledge of their falsity and of the false impression and false representation they caused and conveyed—i.e., the resulting false impression of full disclosure by NCB in relation to the Loan, that the Loan remained in good standing, and that NCB's servicing and management of the Loan was not influenced by undisclosed conflicts of interest arising from NCB's other dealings with Borrower and Guarantor, including, without limitation, the Separate Loan/Extension to Borrower and Guarantor.

118. NCB made the Omissions with the intent to induce Trustar to rely on them by not exercising the Contractual Protections.

119. Trustar detrimentally relied upon the Omissions. Without limitation, Trustar did so by forbearing exercise of the Contractual Protections.

120. Trustar's detrimental reliance upon the Omissions was reasonable. Without limitation, pursuant to the express terms of the Participation Agreement, NCB was charged with the duties and obligations to originate, service, and manage the Loan; to, in doing so, "exercise the same degree of care to protect [Trustar's] interest in the Loan as it does its own interest in the Loan[;]" to timely disclose to Trustar any material default of the Loan or any other matters

materially affecting the interests of the parties to the Participation Agreement; and, in respect to the enforcement and collection of the Loan and the realization upon the collateral, acted and served as Trustar's designated agent. Additionally, Trustar did not know, and in the exercise of reasonable diligence could not have known, that NCB's own conflicting financial interests were influencing NCB's conduct with respect to the Loan.

121. Upon information and belief, NCB made the Omissions because NCB feared that if Trustar learned of the Omitted Matters, Trustar would advocate for, demand, or otherwise press NCB to pursue enforcement action against Borrower and Guarantor—including declaring Borrower in default, accelerating the Loan, or initiating foreclosure on the Real Property—that NCB did not wish to take at that time. NCB concealed the Omitted Matters from Trustar with the intent to deceive Trustar into believing that the Loan remained in good standing and to induce Trustar to refrain from exercising its rights under Section 8 of the Participation Agreement and from pursuing legal action sooner than it did, both of which would have harmed NCB's other relationship with the Guarantor and his affiliates and would have chilled NCB's marketing efforts to merge and/or sell itself to another financial institution.

122. As a direct and proximate result of NCB's fraudulent misrepresentation by omission, Trustar has suffered damages, including but not limited to Trustar itself having been required to classify its impaired participation interest in the Loan as a nonperforming or otherwise adversely classified asset on its own books and regulatory filings, which has resulted in Trustar having to increase its own reserves to account for the anticipated losses associated with the Loan. Additionally, Trustar has incurred and suffered increased carrying costs on the Loan, diminution in the value of the collateral securing the Loan, and impairment of Trustar's Participation Interest, in an amount to be proven at trial but not less than $75,000.00. The severity of this diminution and

impairment is confirmed by the contemporaneous deterioration in Borrower's and Mr. Lobene's financial condition described in ¶¶ 19, 22, 25-28, and 48-59 above, including the defaults, foreclosure, and creditor and investor claims asserted in the Related Actions. Trustar's damages have been further increased by NCB's foreclosure sale of the Real Property and NCB's failure to secure the Real Property against unauthorized occupancy thereafter, as described in ¶¶ 68-69 above.

123. NCB's Omissions were willful, wanton, and taken in conscious disregard of Trustar's rights, entitling Trustar to an award of punitive damages in an amount to be determined at trial.

**WHEREFORE,** Trustar respectfully requests that this Court enter judgment against NCB on Count V, and award Trustar compensatory damages in an amount to be proven at trial but not less than $75,000.00, punitive damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest, costs, reasonable attorney's fees and legal expenses, and such other and further relief as the Court deems just and proper.

## COUNT VI
## DECLARATORY JUDGMENT

124. Trustar incorporates by reference the allegations set forth in ¶¶ 1 through 123 above as if fully set forth herein.

125. Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, an actual, present, and justiciable controversy exists between Trustar and NCB concerning their respective rights and obligations under the Participation Agreement, including but not limited to: (a) whether NCB satisfied its obligations under Section 8 of the Participation Agreement; (b) whether NCB's conduct with respect to the Loan entitles Trustar to the relief demanded in Trustar's June 22, 2026 letter; (c) whether NCB is required, pursuant to Section 12 of the Participation Agreement

("INDEMNIFICATION") to indemnify against and hold Trustar harmless from all of its herein-described damages, including, without limitation, reasonable attorney's fees and legal expenses; and (d) whether, and to what extent, Trustar is obligated to reimburse NCB for the expenses demanded in NCB's July 10, 2026 letter pursuant to Section 10 of the Participation Agreement.

126. Trustar is entitled to a judicial declaration of the parties' respective rights and obligations under the Participation Agreement.

**WHEREFORE,** Trustar respectfully requests that this Court enter a declaratory judgment establishing the parties' respective rights and obligations under the Participation Agreement, consistent with the allegations set forth above, and award Trustar such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Trustar hereby demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

*/s/ Erik D. Bolog*

Erik D. Bolog (D.C. Bar No. 433614)
The Bolog Law Group, P.C.
1763 Columbia Road N.W.
Washington, DC 20009
Telephone: (202) 494-5791
erik.d.bolog@gmail.com

*Counsel for Plaintiff, Trustar Bank*